UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1 SOURCE TOWERS II, LLC,

      Plaintiff,

v.                               CASE NO. 8:21-cv-1225-SDM-SPF

CITY OF LAKELAND, FLORIDA,

      Defendant.

_____/

## ORDER

Under the Telecommunications Act of 1996, 1 Source Towers II, LLC, sues the City of Lakeland, Florida, and claims (1) that no "substantial evidence" supports Lakeland's denial of an application for a cell-service tower and (2) that the denial prohibits or effectively prohibits personal wireless service in an identified area of Lakeland. Source Towers requests declaratory relief and a mandatory injunction that compels Lakeland to grant the tower application. During a two-day bench trial, each party presented witnesses and argument. Each party submits proposed findings of fact and conclusions of law (Docs. 69 and 70), and each party responds (Doc. 71 and 72) to the opposing party's findings of fact and conclusions of law.

### FINDINGS OF FACT

Source Towers, a "macro" cell-phone-tower developer, identified an area surrounding 1800 Harden Boulevard, Lakeland, Florida, as an "area of interest" in which to construct a cell-phone tower. After searching for interested wireless carrier

providers, Source Towers discovered that Verizon Wireless wanted to improve cellular service in a roughly three-mile area near 1800 Harden Boulevard.  Upon Verizon's furnishing a "search ring," which "defines the area that [Verizon] would like a tower in," Source Towers began searching for a suitable site on which to construct a tower for Verizon's use.  (Doc. 67 at 44)  Verizon's "search ring" was a circle with a quarter-mile radius and with the center located south of 1800 Harden Boulevard at the intersection of Harden Boulevard and West Beacon Road.  Ideally, Verizon wanted Source Towers to construct the new tower at the center of the circle.  But after investigating fourteen parcels of land, Source Towers secured a lease for 1800 Harden Boulevard, located about 150 feet outside the search ring.

After securing the lease, Source Towers applied to Lakeland for a conditional-use permit to construct on the leased property a 110-foot close-mount monopole.[1] Source Towers needed a conditional use permit because, in accord with Lakeland's land development code, a 110-foot tower requires at least 220 feet of separation from the nearest border of any residential lot or from any "arterial street[]."[2]  But 1800 Harden Boulevard has a residential lot 43.1 feet to the north; a residential lot 114.1 feet to the east; and an "arterial street," Harden Boulevard, 118.7 feet to the west.

_____

[1] A close-mount monopole is a "singular pipe structure" with antennas "closer to the cylindrical part of the tower."  (Doc. 68 40–41)

[2] Section 5.18.5.1(f), Lakeland Land Development Code, states, "A ground-mounted [personal wireless service] facility shall be separated from any residential lot line a minimum of two feet horizontally for each one foot in facility height."  Section 5.18.5.1(g) states, "A ground-mounted PWS facility shall be separated from . . . arterial streets and highways . . . a minimum of two feet horizontally for each one foot in facility height."

On two occasions, Source Towers appeared before the Lakeland Planning and Zoning Board to discuss the conditional use application. Source Towers proffered testimony to support the application and presented photographic simulations portraying the proposed tower's appearance if viewed from the surrounding area. The zoning board consulted Section 5.18.7(c), Land Development Code, which states:

> In determining whether to grant a conditional use pursuant to this section, the City Commission shall consider the following factors:
>
> 1. The height and visual obtrusiveness of the facility;
> 2. The degree of visibility from the public view;
> 3. The proximity of the facility to residential structures and residential district boundaries;
> 4. The character of the uses and structures on adjacent and nearby properties;
> 5. The character of the land, including topography and tree coverage;
> 6. The design of the facility with particular reference to design characteristics that have the effect of reducing or eliminating visual obtrusiveness;
> 7. The degree to which the facility reduces the proliferation of visually obtrusive structures through co-location; and
> 8. Competent evidence that reasonable alternatives to the proposed conditional use do not exist.

The zoning board's denial of the application explains under each of the eight considerations the proposed tower's effect on the community.

Source Towers appealed the zoning board's denial to the Lakeland City Commission and argued that the commission should reverse the zoning board's decision because the zoning board's decision "effectively prohibited Verizon Wireless from solving a significant gap in [Verizon's] service." (Doc. 65-8 at 1) After a hearing, the commission denied the appeal for the following reasons. First, the zoning board "did not fail to properly apply adopted standards or regulations and administrative

staff did not fail to follow professional practice in performing technical analysis."
(Doc. 66-3 at 2)  Second, the zoning board's rationale "legally justified" the denial.
(Doc. 66-3 at 2)

## CONCLUSIONS OF LAW

Under the Telecommunications Act of 1996, a local government retains the authority, subject to enumerated limitations, "to regulate the location, construction, and modification of wireless telecommunication facilities."  *T-Mobile South, LLC v. City of Roswell, Ga.*, 574 U.S. 293, 300 (2015) (internal quotations omitted).  For example, 47 U.S.C. § 332(7)(B)(iii) requires that a local government support with "substantial evidence" the denial of a request to construct a cell-service tower.  Another limitation, Section 332(7)(B)(i)(II), states that a local government's regulation of "personal wireless service facilities . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  Source Towers claims that Lakeland violated each limitation.[3]

## I.  Section 332(7)(B)(iii)

Under Section 332(7)(B)(iii), a local government's denial of an application to construct a personal wireless facility "shall be . . . supported by substantial evidence contained in a written record."  Substantial evidence means evidence that "a

-----

[3] Neither party moved for summary judgment.  Although each party draws from the facts a different conclusion, no party contests the facts. Much of the testimony at trial repeated the facts proffered during the hearing before Lakeland's zoning board.  Also, like any review of an agency decision, the substantial evidence standard limits a district court's review to the facts in the record before the local government hearing.  Any new fact adduced at trial cannot contribute to the substantial evidence decision.

- 4 -

reasonable mind might accept as adequate to support a conclusion." *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1218 (11th Cir. 2002). Nothing in Section 332(7)(B)(iii) alters the substantive standard (defined by local regulation) on which a local government bases an approval or a denial of an application to construct personal wireless facility. *Preferred Sites*, 296 F.3d at 1219. Section 332(7)(B)(iii) requires only that "the local authority's decision is consistent with the applicable local zoning requirements." *T-Mobile South LLC v. City of Jacksonville, Fla.*, 564 F. Supp. 2d 1337, 1345 (M.D. Fla. 2008) (Moore, J.). Source Towers has the burden of proving that no substantial evidence supports Lakeland's decision. *Michael Linet, Inc.*, 408 F.3d 757, 762 (11th Cir. 2005).

Lakeland's Community and Economic Development Department recommended to Lakeland's Planning and Zoning Board a denial of Source Towers's application. (Doc. 66-5 at 8) In an eleven-page paper, the Development Department analyzed Source Towers' application under each of the eight factors in the Land Development Code that determine whether to grant a conditional use permit for a personal wireless facility. (Doc. 66-2) The Development Department recommended denying the application because "the degree of nonconformity for the proposed tower with the separation standards is substantial and the applicant has failed to provide a design that mitigates for the visual impact." (Doc. 66-2 at 6) Based on the recommendation, the Zoning Board denied the application. (Doc. 66-5 at 40-41) Substantial evidence —testimony from the December 15, 2020 public hearing; site visits by the city's staff; and photographic simulations of the proposed tower —

- 5 -

supports the Zoning Board's denial.  (Doc. 66-2 at 6)  On appeal, the City Commission affirmed the denial because the denial "was legally justified by the recommendation and rationale of the [Development Department]."  Because substantial evidence supports the Development Department's recommendation and each subsequent decision by Lakeland relies on the Development Department's recommendation, Lakeland complied with Section 332(7)(B)(iii).

## II. Section 332(7)(B)(i)(II)

Under Section 332(7)(B)(i)(II) a local government's regulation of the construction of "personal wireless service facilities . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  Each party acknowledges that no binding decision defines or discusses the clause "shall not prohibit or have the effect of prohibiting the provision of personal wireless service."  Relying on decisions from district courts within the Eleventh Circuit, Source Towers argues that a local government violates the statute if the local government denies an application for the least intrusive solution to a "significant gap in service."  Although Lakeland acquiesces to this interpretation, no party explains how this interpretation derives from, and comports with, the statutory text.

The interpretation advanced by each party originates in *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630 (2d Cir. 1999), in which the service provider, Sprint, argued that under Section 332(7)(B)(i)(II) a service provider enjoys the right to construct any tower that the provider "deems necessary to compete effectively with other telecommunications providers, wireless or not."  176 F.3d at 639.  *Sprint* reasons that

because most service providers would apply for a tower only if the provider deems the tower necessary, Sprint's proposed interpretation "would effectively nullify a local government's right to deny construction of wireless telecommunications facilities." 176 F.3d at 639. In contrast, the local government, Ontario, New York, argued that Section 332(7)(B)(i)(II) prohibits a blanket prohibition only and that "courts can only consider whether in aggregate a town's repeated denials of applications have the effect of a general ban." 176 F.3d at 640. *Sprint* determines that Ontario's interpretation counters the statute's purpose of encouraging "the rapid deployment of new telecommunications technologies" because the interpretation "would lead to the untenable result that once personal wireless services are available somewhere within the jurisdiction, the . . . government could deny any further applications with impunity." 176 F.3d at 641.

 *Sprint* states that the meaning of "personal wireless service" in Section 332(7)(B)(i)(II) reveals the proper interpretation of the entire provision. 176 F.3d at 641. To discern the meaning of "personal wireless service," *Sprint* reviews Section 332(c)(7)(C)(i), which defines "personal wireless service" as "[1] commercial mobile services, [2] unlicensed wireless services, and [3] common carrier wireless exchange access services." 176 F.3d at 641 (alterations in original). Realizing that the statute further defines each "component" of "personal wireless service," *Sprint* recites the statutory definition of "commercial mobile services," "unlicensed wireless services," and "common carrier wireless exchange access services." 176 F.3d at 641-42. *Sprint* combines "those [components] relevant to [the] case" to conclude that under Section

332(7)(B)(i)(II) a local government may not prohibit "for-profit radio communication services carried on between mobile stations or receivers and land stations that (1) are connected to the national telephone network and that (2) provide wireless phones with access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services."  176 F.3d at 642.

*Sprint* clarifies that "local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines."  176 F.3d at 643. But under *Sprint* a local government's right to deny applications remains because "[a] local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means."  *Sprint*, 176 F.3d at 643 (citing *Town of Amherst, N.H. v. Omnipoint Communications Enterprises, Inc.*, 173 F.3d 9 (1st Cir. 1999)).  Incorporating the technical statutory definition of "personal wireless service" and delivering an interpretation consistent with the text of Section 332(7)(B)(i)(II), *Sprint* holds that the prohibition of "personal wireless service" means the prohibition of a service provider's effort "to fill gaps in the ability of wireless telephones to have access to land-lines."  176 F.3d at 643.

Although later decisions embrace *Sprint*'s assertion that a local government must allow a service provider to "fill gaps," the decisions ignore the narrow, technical, and statutorily established definition of "personal wireless service" and without explanation or definition describe the gap as an area without "service" or "coverage."  *Cellco Partnership v. City of Valdosta, Georgia*, 574 F. Supp. 3d 1318, 1335 (M.D.

Ga. 2021) (ruling that the first "prong" of the standard to determine an "effective prohibition" requires a court to answer "whether a significant gap exists in the provider's own coverage"); *PI Telecom Infrastructure, LLC v. City of Jacksonville, FL*, 104 F. Supp. 3d 1321, 1346 (M.D. Fla. 2015) ("The Court turns to the first step in the analysis: whether PI Telecom has demonstrated that its proposal would remedy a significant gap in service."). By re-characterizing the "gap," later decisions depart from the statutory language, which protects the provision of statutorily defined "personal wireless services," not the provision of general or provider-defined "coverage" or "service."

Source Towers and Lakeland describe the gap as affecting Verizon's "coverage" or "service." Neither Source Towers nor Lakeland defines "coverage" or "service," and a review of decisions across the country reveals no clear definition. Because Section 332(7)(B)(i)(II) protects the "provision of personal wireless services," a term defined by Section 332(7)(C)(i), a decision's using "coverage" or "service" without defining either term permits divergence from the statutory text. If Section 332(7)(B)(i)(II) protects the provision of any type of "coverage" or "service," and not the provision of "personal wireless services" only, the section likely encompasses a provider's ability to update, over local-government objection, a provider's technology, even if the existing technology provides adequate "personal wireless services." Under this interpretation, judges might wrongfully expand Section 332(7)(B)(i)(II) either to protect the provision of services that did not exist in 1999 (when Congress passed the law) or to protect the provision of services that existed but Congress

intentionally excluded.  *See Bostock v. Clayton County, Georgia*, 590 U.S. 644, 654–55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms . . . we would risk amending statutes outside the legislative process reserved for the people's representatives.").

Also, later decisions attribute to an alleged "circuit split" *Sprint*'s rule about the availability of "less intrusive means." *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 50 (1st Cir. 2009), explains that the First Circuit and the Seventh Circuit forbid a denial if the proposed tower is "the only feasible plan" and cites for support of this position both *Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620 (1st Cir. 2002), and *Town of Amherst, N.H.*, 173 F.3d at 14.  *Omnipoint* contrasts the First and Seventh Circuit's position with the position of the Second, Third, and Ninth Circuit, each of which forbids a denial if the proposed tower "is the least intrusive means."  586 F.3d at 50.  In support of this position, *Omnipoint* cites *Sprint*, 176 F.3d at 643.  *Omnipoint* observes that "[i]t is unclear how much these different articulations of the tests truly differ."  And a review of the decisions cited in *Omnipoint* confirms that the tests differ little, if at all.

For example, in *Amherst*, Omnipoint, a wireless service provider, applied to he Town of Amherst's zoning board to construct four 190-foot towers in the Town of Amherst.  173 F.3d at 11.  The zoning board denied each proposal. *Amherst*, 173 F.3d at 13.  Omnipoint sued and asserted a violation of Section 332(7)(B)(i)(II).  *Amherst*, 173 F.3d at 12-13.  After each party moved for summary judgment, the district

- 10 -

court decided that Amherst effectively prohibited the provision of personal wireless services. *Amherst*, 173 F.3d at 113.

On appeal, Amherst argued that Section 332(7)(B)(i)(II) prohibits only an explicit ban of cell-service facilities. *Amherst*, 173 F.3d at 14. *Amherst* rejects this argument and holds that "some individual decisions could be shown to reflect, or represent, an effective prohibition on personal wireless service." 173 F.3d at 14. *Amherst* elaborates, "If the criteria or [a government's] administration effectively preclude towers no matter what the carrier does, they may amount to a ban 'in effect.'" 173 F.3d at 14. Under *Amherst*, to prove that a local government will preclude towers "no matter what," a carrier must "show from language or circumstances not just that *this* application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." 173 F.3d at 14.

Applying these principles, *Amherst* finds that nothing in the record supports the speculation that Amherst would reject a further application from Omnipoint. 173 F.3d at 14. *Amherst* conjectures, "Were Omnipoint's existing proposal the only feasible plan, then prohibiting its plan might amount to prohibiting personal wireless service." 173 F.3d at 14. But Omnipoint's proposal comprised "standard height towers at optimal locations" to minimize the amount of towers needed and to minimize the cost for Omnipoint. *Amherst*, 173 F.3d at 14. *Amherst* notes that Omnipoint could provide personal wireless service with lower towers in a different location and that under the statute the balancing of alternative tower and service plans remains the prerogative of the local government. 173 F.3d at 15. *Amherst* holds that although

Omnipoint had a sound business reason to propose only one plan, the denial of the plan without Omnipoint's proposing "serious alternatives" to Amherst amounts to less than an effective prohibition of personal wireless services. *Amherst*, 173 F.3d at 15.

Decided less than two months after *Amherst*, the Second Circuit's *Sprint* introduces the now-popular terms "significant gap" and "least intrusive means." *Sprint* announces, "A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means." 176 F.3d at 643. Supporting this statement, *Sprint* cites "*Amherst*, 173 F.3d at 14 ('[I]ndividual denial is not automatically a forbidden prohibition,' but disallowing 'the only feasible plan . . . might amount to prohibiting personal wireless service.')." 176 F.3d at 643. *Sprint* lists the "numerous ways" a tower might offer a "less intrusive" alternative. 176 F.3d at 643.

Decided in 2002, *Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 630 (1st Cir. 2002), discusses the "effective prohibition" clause. *Second Generation* decides that a local government's denial impermissibly prohibits "in effect" the provision of personal wireless services if the provider's "application is the only feasible plan" and cites *Sprint* as directly supporting this proposition. 313 F.3d at 630.

*Pelham*'s reliance on *Sprint* and *Sprint*'s reliance on *Amherst* confirm that the tests, although stated differently, lack any practical difference. Tracing the circuit-court "split" back to the origin reveals only a semantic distinction. Labeling the First

- 12 -

and Second Circuit's decisions as conflicting misunderstands each decision and either creates or perpetuates an artificial debate.

Although purporting to follow the *Sprint* interpretation, the "test" advanced by Source Towers comports with neither the statute nor the reasoning on which the earlier decisions achieve an accurate interpretation of Section 332(7)(B)(i)(II).[4]  The goal of fairly and properly effecting Section 332(7)(B)(i)(II)'s mandate demands a return to the statute.

Even if a term's ordinary meaning varies from the "express" statutory definition, "a court must respect" Congress's defining a term in a statute.  *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024).  An "express" statutory definition "is 'virtually conclusive.'"  *Sturgeon v. Frost*, 587 U.S. 28, 56 (2019) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 228 (2012)).  *Sprint* accomplishes "a detailed parsing of the statutory language, including layers of highly technical definition," but nothing commends this order's repeating *Sprint*'s "regrettabl[e]" task.  Based on the statute and on *Sprint*'s interpretation, this order concludes that "personal wireless services" means the "ability of mobile, hand-held

---

[4] Source Towers argues that a service provider satisfies the "least intrusive means" test if the provider in good faith has attempted to "identify and evaluate less intrusive alternatives."  By allowing the service provider to decide the "least intrusive" solution, likely the solution that best serves the provider's interest, Source Towers' interpretation removes the power of the local government to determine the best solution for the community or the "least intrusive" solution according to the community's standard.  *See 360 degrees Communications Co. of Charlottesville v. Board of Supervisors of Albermarle County*, 211 F.3d 79, 87 (4th Cir. 2000) ("A community could rationally reject the least intrusive proposal in favor of a more intrusive proposal . . . that better promotes commercial goals of the community."); *Amherst*, 173 F.3d at 15 (explaining that Congress reserved to the local government the choice between tower options).

telephones to reach a cell site that provides access to a land-line exchange and allows phone calls to be made to and from the national telephone network." 176 F.3d at 641.

The statutory definition in Section 332(7)(B)(i)(II) forbids a local government's prohibiting or effectively prohibiting the provision of service that allows a mobile phone to complete a call. The statute requires no additional elaboration and no multi-"pronged" test. If a local regulation, as applied locally, has the effect of pro-hibiting "personal wireless service" that can support a call, the denial violates Section 332(7)(B)(i)(II). *360 degrees*, 211 F.3d at 86 (explaining that the statute requires no "additional formulation" because "determinations about what constitutes the 'least intrusive means' and 'a significant gap' . . . quickly devolve into the broader inquiry indicated by the language of the statute").

The evidence shows that Source Towers applied for the 110-foot close-mount monopole at 1800 Harden Boulevard because Verizon wished to improve "unreliable coverage" in an identified three-square-mile area. (Doc. 67 at 148) Although "cov-erage" has a technical meaning different from capacity, Verizon's "unreliable cover-age" in the area stems from a capacity deficiency on Verizon's 700-megahertz fre-quency. (Doc. 67 at 139) Capacity describes a phone's ability to obtain a "resource block," which enables the phone to load a web page, send a text, or place a phone call. (Doc. 68 at 33-34) Verizon measures capacity with an "internal metric called composite utilization," and a tower with a composite utilization of more than 0.8 (in other words, the tower is 80-or-more percent utilized) prompts Verizon to resolve (or

- 14 -

attempt to resolve) the "capacity need in the area." (Doc. 67 at 139)  A tower near 1800 Harden Boulevard with a composite utilization of more than 0.8 induced Verizon's "need" for the tower at 1800 Harden Boulevard. (Doc. 67 at 139)

Verizon's radio-frequency engineer explained that a phone in the area with "unreliable coverage" "may have AWS signal, but once you're indoors [Verizon] cannot guarantee access to that frequency." (Doc. 67 at 160)  During a peak-usage hour, a phone would experience "a lot of buffering" while watching a video, downloading an e-mail, or using the map application. (Doc. 67 at 164)  "Buffering" means a phone's waiting for an available resource in the network. (Doc. 67 at 164) But the network prioritizes voice traffic over any other data package. (Doc. 67 at 165)  The network drops other "data packages that are not voice to allow the voice package to go through." (Doc. 67 at 165)  If the network reaches "so much congestion and many people are trying to use voice at the same time," a phone would not complete the call. (Doc. 67 at 165)  Theoretically, a network "could reach that level." (Doc. 67 at 165)

Source Towers fails to establish that the identified area lacks "personal wireless services" as defined by Section 332(7)(B)(i)(II).  The testimony shows that under Verizon's internal metrics Verizon's "need" to "improve" coverage is based on the objective of "provid[ing] [the consumer] with the most bandwidth that [Verizon has] available." (Doc. 67 at 140)  But no testimony establishes that the service in the area cannot support a call.  Nothing in Section 332(7)(B)(i)(II) requires the local government to submit to a provider's goal to improve service or requires the local

government to allow the provision of "the most bandwidth" available.  Because Source Towers adduces no evidence showing that absent the tower at 1800 Harden Boulevard the service could not support a voice call, Source Towers fails to prove that Lakeland's denial of the tower prohibits or effectively prohibits "personal wireless services."

Even if the denial of Source Towers' application results in a mobile phone's inability to complete a phone call in this area, the denial of an application for a single tower might not violate Section 332(7)(B)(i)(II) because "services can be effected from numerous sites in various combinations." *360 degrees Communications Co. of Charlottesville*, 211 F.3d at 86.

The record shows that a different type of tower, or several types of towers, constructed at different locations might satisfy Verizon's demands.  To create greater capacity in the area, Verizon planned to "offload" to 1800 Harden Boulevard the 700-megahertz frequency with a 110-foot close mount monopole, which supports radios that emit a 2100-megahertz frequency known as AWS.  Source Towers evaluated other locations, but 1800 Harden Boulevard represented the most profitable and technologically efficient location.  (Doc. 66-15 at 1; Doc. 67 at 85, 138, 151; Doc. 68 at 13, 61)  Source Towers considered proposing two locations for the monopole to Lakeland, but decided to propose only the 1800 Harden Boulevard location because of more "agreeable" "financials."  (Doc. 67 at 85)  Source Towers' decision corresponds to Source Towers' goal to "make money."  (Doc. 68 at 13)  Also, Verizon never evaluated whether a different tower, such as a unipole, a small-cell tower, or

several towers, could cure Verizon's purported "gap."  (Doc. 67 at 186–87, 196; Doc. 68 at 83)

A business judgment to maximize profit underlies Source Towers's decision to apply for the tower at 1800 Harden Boulevard.  But Lakeland, under no obligation to approve Source Tower's most lucrative option, has not — in effect — prohibited the provision of service.  *See Amherst*, 173 F.3d at 15.  Also, because Source Towers could devise a plan of more than one tower to cure Verizon's service need, Lakeland's denial of 1800 Harden Boulevard accomplishes no prohibition of personal wireless services.

## CONCLUSION

The clerk must enter a judgment for the City of Lakeland, Florida, and against 1 Source Towers II, LLC.  The motion (Doc. 47) in limine is **DENIED AS MOOT**. The clerk must close the case.

ORDERED in Tampa, Florida, on July 25, 2024.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 17 -